*458 DE MUNIZ, J.
This case requires us to examine the operative text of a voter-approved ballot measure that purported to depend for its efficacy upon the passage of a companion measure that voters rejected. The trial court concluded that the text at issue was severable from the ballot measure and ruled that the remaining provisions of the measure were, according to the plain text of the measure itself, dormant. The Court of Appeals affirmed that judgment. Hazell v. Brown, 238 Or App 487, 242 P3d 743 (2010). For the reasons set out in this opinion, we also affirm the trial court’s judgment and the decision rendered by the Court of Appeals.
FACTS AND PROCEDURAL BACKGROUND
In 2006, two ballot measures were placed before Oregon voters at the polls. One — -Measure 46 (2006)— sought to amend the Oregon Constitution to permit the enactment of laws prohibiting or limiting electoral campaign “contributions and expenditures, of any type or description.” The other — Measure 47 (2006) — sought to create new campaign finance statutes that would, essentially, statutorily implement the constitutional changes proposed in Measure 46. Voters, however, rejected Measure 46 while approving Measure 47. Among other things, Measure 47 contained a clause at section 9(f) that provided:
“If, on the effective date of this Act, the Oregon Constitution does not allow limitations on political campaign contributions or expenditures, this Act shall nevertheless be codified and shall become effective at the time that the Oregon Constitution is found to allow, or is amended to allow, such limitations.”
Relying on that provision, the Secretary of State’s office took the position that, in light of Measure 46’s defeat at the polls, Measure 47 was, by its own terms, unenforceable. It stated:
“The plain text of Section (9)(f) requires that the entire measure is to be codified as part of the statutory law of Oregon. That text also specifies that ‘this Act’- — referring singularly to the entire measure — will be ineffective until such time as ‘the Oregon Constitution is found to allow, or is amended to allow,’ limitations on campaign contributions *459 and expenditures. Because Measure 46 was not approved by the people, the conditions required by Section (9)(f) for the rest of measure 47 to become operative will not have been fulfilled on December 7, 2006. Accordingly, the effect of Section (9)00 is that no part of the measure presently is enforceable. According to the plain, natural, and ordinary meaning of the words of Section (9)(f), all of Measure 47 will remain dormant until such time as ‘the Oregon Constitution is found to allow, or is amended to allow,’ limitations on campaign contributions and expenditures.”[1]
Several of the measure’s chief petitioners, together with other Oregon voters, responded to that determination by bringing an action against both the Secretary of State and the Attorney General (collectively, the state), seeking declaratory and injunctive relief to compel enforcement of Measure 47. In response, the Center to Protect Free Speech, Inc., and its president, Fred Vannatta, intervened to oppose that action, asserting that section 9(f) of Measure 47 violated Article I, section 21, of the Oregon Constitution, rendering the entire measure void. On cross-motions for summary judgment filed by all the parties, the trial court ruled in the state’s favor, concluding that Measure 47 was presently inoperative.
In a letter opinion to the parties, the trial court found the text and context of section 9(f) to be unambiguous as to the meaning and effect of Measure 47:
“The text of section (9)(f) describes a condition, then mandates the consequences if that condition obtains. The condition triggering section (9)(f) is that ‘on the effective date of this Act, the Oregon Constitution does not allow limitations on political campaign contribution and expenditures.’ The mandated consequence if that condition obtains is that the ‘Act shall nevertheless be codified and shall become effective at the time that the Oregon Constitution is found to allow, or is amended to allow, such limitations.’ As held above, the triggering circumstances unambiguously existed and were not changed by Measure 46, which did not pass. The unambiguous consequence is that Measure 47, in its entirety, presently is not operative.”
*460 The trial court reached similar conclusions regarding the constitutionality of section 9(f), rejecting the argument that the section violated Article IV, section l(4)(d), because it altered the effective date of Measure 47 rather than its operative effect. The trial court wrote:
“That contention is answered completely by State v. Hecker, 109 Or 520 (1923). Hecker makes clear that section (9)(f)’s use of the term ‘shall become effective’ must be construed to mean ‘shall become operationally effective.’ So construed, as in Hecker, section (9)(f) conflicts with no constitutional requirements as to the effective date of legislation passed by initiative.
“Nor is the indeterminate nature of the contingency fatal to the provision’s effect. In Hecker, the challenged statute was to become operative whenever constitutionally authorized, without any specification of an election at which such a proposal might be considered. * * * Nevertheless, the Oregon Supreme Court upheld the contingency. Section (9)(f) similarly may be sustained under that directly controlling authority, at least with respect to the operative effect being contingent on amendment of the Oregon Constitution.”
(Emphasis in original.)
As to intervenors’ argument that section 9(f) violated Article I, section 21, the trial court first held that
“the contingency rendering Measure 47 operative if it is authorized by constitutional amendment is exactly the same contingency upheld in Hecker. Section (9)(f)’s direction that Measure 47 shall become operative upon amendment of the constitution to allow [campaign contribution and expenditure] limits is permissible.”
The trial court, however, declined to directly address the second contingency in section 9(f), i.e., whether Measure 47 could properly become operative on a future judicial finding. It concluded, instead, that, even if the measure’s operative effect could not constitutionally depend on such an occurrence, ORS 174.040 permitted it to sever the offending portion and to give effect to the remainder of section 9(f).
*461 Plaintiffs appealed, and the Court of Appeals affirmed the trial court. In doing so, the Court of Appeals similarly concluded that Measure 47 was inoperative:
“In sum, the substantive provisions of Measure 47 did not, and will not, become operative unless or until Article I, section 8, is amended to permit limitations of the sort deemed unconstitutional in Vannatta I or until the Oregon Supreme Court revisits Vannatta I and determines that such limitations are constitutional under Article I, section 8.”
Hazell, 238 Or App at 512. We subsequently allowed plaintiffs’ petitions for review. For the reasons set out below, we affirm the Court of Appeals decision and the trial court’s judgment.
ADDITIONAL BACKGROUND — MEASURE 47
The history of this case goes back nearly 18 years to 1994, when Oregon voters enacted Ballot Measure 9 (1994), a citizen initiative that, among other things, set mandatory limits on monetary contributions to state political campaigns. In 1997, this court held in Vannatta v. Keisling, 324 Or 514, 931 P2d 770 (1997) (Vannatta I), that such limits — together with campaign expenditure limits-— violated the free expression rights guaranteed by Article I, section 8, of the Oregon Constitution. Later, specifically citing Vannatta I for that proposition in 2006, this court stated:
“Since the inception of the Oregon Constitution, Article I, section 8, strictly has prohibited any legislation ‘restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever[.]’ Under Oregon law, both campaign contributions and expenditures are forms of expression protected by that constitutional provision, thus making legislatively imposed limitations on individual political campaign contributions and expenditures impermissible. See Vannatta v. Keisling, 324 Or 514, 524, 931 P2d 770 (1997) (so holding).”
Meyer v. Bradbury, 341 Or 288, 299, 142 P3d 1031 (2006) (brackets in original).
At the 2006 election that followed that decision, Oregon voters were subsequently invited to amend Oregon’s *462 campaign finance laws by approving citizen-initiated Measure 46 and Measure 47. If passed, Measure 46 would have amended the Oregon Constitution to expressly allow laws limiting or prohibiting election contributions and expenditures, as long as such laws were either the product of citizen initiatives or otherwise adopted by three-quarters of both legislative houses.
While Measure 46 would have amended the Oregon Constitution, Measure 47, if adopted, was slated to amend the Oregon statutes to address the lack of “reasonable limits on political campaign contribution and expenditures” contained in the current statutes. As part of an extensive array of findings, section 1(a) of Measure 47 linked virtually all of the provisions of the measure to the ultimate goal of reining in the undue influence of campaign contributions and expenditures that, from its drafter’s perspective, were too large:
“The democratic process has not functioned properly in Oregon, due to the lack of reasonable limits on political campaign contributions and expenditures, including expenditures made independently of candidates, on races for state and local public office. Oregon is one of only five states in the United States with no limits on political campaign contributions. All of the prohibitions, limits, and reporting and disclosure requirements of this Act are reasonable and necessary to curb the undue influence of large contributions and expenditures”
(Emphasis added.)
Measure 47 went on to set out a new chapter of Oregon laws devoted solely to creating and implementing a variety of limitations on campaign contributions and expenditures. For example, Measure 47 limited amounts that could be contributed to candidates, political committees, or political parties. It limited contributions that candidates could make to their own campaigns, and prohibited them from making loans to their own campaign committees. It banned, with certain exceptions, corporations, labor unions, and certain individuals from making campaign contributions altogether, and prohibited campaigns and political parties from accepting contributions that were impermissible under the measure’s provisions.
*463 Measure 47 also imposed mandatory limits on political expenditures by limiting the amount that persons could spend to directly communicate support for, or opposition to, a political candidate or party. In addition, the measure prohibited — with some exceptions — similar expenditures by corporations, labor unions, and certain individuals. Measure 47 further limited the amount that candidates and political committees could spend to oppose or support a candidate or party.
In addition to those contribution and expenditure provisions, Measure 47 set out various disclosure and reporting requirements. It delineated how the state was to administer, track, and publish information concerning candidate contributions and expenditures, and it imposed penalties for violating the measure’s various restrictions.
The drafters of Measure 47, however, were clearly cognizant of the constitutional barriers that could hinder implementation of the measure if it were enacted without substantive changes to either the Oregon Constitution or this court’s prior interpretation of that document’s free expression provision. Consequently, additional findings set out as section l(r) of Measure 47 explicitly linked the time at which the measure would “take effect” to a time— unspecified — that the Oregon Constitution would allow the campaign finance limitations proffered by the measure. Section l(r) provided:
“In 1994, voters in Oregon approved a statutory ballot measure, Measure 9, establishing contribution limits similar to those in this Act, by an affirmative vote of 72 percent. The Oregon Supreme Court in 1997 found that those limits were not permitted under the Oregon Constitution. This Act shall take effect at a time when the Oregon Constitution does allow the limitations contained in this Act”
(Emphasis added.)
As noted, at the 2006 general election, Oregon voters rejected Measure 46 but passed Measure 47. This action followed.
DISCUSSION
For the reader’s convenience, we again set out section 9(f) of Measure 47:
*464 “If, on the effective date of this Act, the Oregon Constitution does not allow limitations on political campaign contributions or expenditures, this Act shall nevertheless be codified and shall become effective at the time that the Oregon Constitution is found to allow, or is amended to allow, such limitations.”
In seeking declaratory and injunctive relief here, plaintiffs consist of two groups — Hazell, Nelson, Civiletti, Delk, and Duell (Hazell plaintiffs), and Horton and Lewis (Horton plaintiffs). Each group presents different arguments concerning the validity and overall effects of section 9(f) on the other provisions of Measure 47.
We begin with the Hazell plaintiffs, who take the position that the precipitating condition set out in section 9(f) has yet to occur. Section l(r) of Measure 47, they point out, expressly provides that the measure “will take effect at a time when the Oregon Constitution does allow the limitations contained in this Act.” (Emphasis added.) They argue that, in the context of that provision, the reference to “limitations” in section 9(f) should be narrowly construed to mean only those limitations set out in Measure 47 — not the limitations previously held unconstitutional in Vannatta I. Because Measure 47 became effective in December 2006, the Hazell plaintiffs continue, determining whether the condition anticipated by section 9(f) has been met or not requires this court to first determine the constitutionality of each provision of Measure 47, a process that, in turn, would implicitly require us to revisit Vannatta I.
Alternatively, they assert that a literal, less context-driven interpretation of section 9(f) yields the same result. As they argued below, they again contend that, as of the effective date of Measure 47, the Oregon Constitution did, in fact, allow some finance-related campaign limitations. According to the Hazell plaintiffs, those limitations presently take the form of various registration, reporting, and identification requirements for contributors, as well as the requirement that contributions be used only for bona fide campaign expenses or to defray the costs of a recipient’s duties as a public office holder. Given the existence of those restrictions, the Hazell plaintiffs argue, the condition set out in section 9(f) has yet to arise, a circumstance that again places the *465 onus of determining the substantive constitutionality of all the provisions of Measure 47 with this court.
The problem with those arguments, however, is that they assume that we must interpret section 9(f) in isolation, where the controlling context for our analysis is Measure 47 and little else. That assumption, however, ignores the nature of legislative power and the judicial decisions that arguably gave rise to the enactment of Measure 47.
We have recognized that the legislative power is a unitary authority that rests with two lawmaking bodies, the legislature and the people. Meyer v. Bradbury, 341 Or 299-300. The exercise of that power is always “coequal and co-ordinate,” regardless of which of the two entities wields it. Id. at 300. For that reason, we apply a similar method of analysis to statutes enacted by voter-initiated measures as we do to statutes enacted by the legislature, with the goal of discerning the intent of the voters who passed those initiatives into law. State v. Guzek, 322 Or 245, 265, 906 P2d 272 (1995).
We begin with the statutory text. Roseburg School Dist. v. City of Roseburg, 316 Or 374, 378, 851 P2d 595 (1993). As the Court of Appeals observed, the pertinent “statutory language is ‘limitations on’ contributions or expenditures— and not ‘limitations relating to’ contributions or expenditures.” Hazell, 238 Or App at 507 (emphasis in original). In other words, the text of section 9(f) implies that that provision is intended to refer to direct limitations on the act of contributing or expending campaign funds, not on collateral requirements such as reporting and timely disclosure regarding the receipt or expenditure of campaign funds.
The Court of Appeals also noted that the “enacting and operative effective clauses of section 9(f) both have the same single and undivided referent: ‘This Act.’”Id. Like the Court of Appeals, we view the use of the phrase “This Act” as evidence that the voters intended and understood that, if and when Measure 47 became operative, it would do so as a whole piece of legislation, not in some piecemeal fashion.
A well-established part of our interpretive methodology requires that we presume that laws are *466 enacted in light of the judicial decisions that preceded and bear directly on them. Weber and Weber, 337 Or 55, 67-68, 91 P3d 706 (2004). Here, our holdings in Vannatta I and Meyer establish that, at the time that the voters considered Measure 47, campaign contributions and expenditures in Oregon were constitutionally protected forms of expression, and the legislature could not limit them. The plethora of mandatory contribution and expenditure limitations set out in Measure 47 contrast sharply with those holdings, leading us to conclude that Vannatta I and Meyer clearly have a direct bearing on the measure. In that context, the limitations cited in section 9(f) are most logically viewed broadly as the same kind of limitations struck down in Vannatta I and Meyer, namely, “legislatively imposed limitations on individual political campaign contributions and expenditures.” Meyer, 341 Or at 299.
That reading of section 9(f) is further reinforced by the findings that make up a substantial part of Measure 47. As we already have noted, the findings in section l(r) acknowledge the campaign finance limitations passed by voters in 1994, the similarity of those limitations to the restrictions of Measure 47, and the fact that this court subsequently held that the Oregon Constitution did not permit such limitations. At the same time, the findings in section 1(a) suggest that, now, the lack of reasonable limits on campaign finances have interfered with the proper function of Oregon’s democratic processes by permitting undue influence from large campaign contributions and expenditures; as a result “[a]ll of the prohibitions, limits, and reporting and disclosure requirements” of Measure 47 are reasonably necessary to remedy that situation.
Those findings, however, depict a problem rooted in the broad constitutional prohibition articulated in Vannatta I and Meyer. The substantive provisions of Measure 47 are, according to the measure’s own terms, aimed at correcting problems that have arisen, at least in part, because legislatively imposed limitations on campaign contributions and expenditures are subject to the constitutional bar articulated in those decisions. However, if Measure 47 is to have any operative effect at all, that bar must, at some point, be removed. Consequently, the “limitations on political *467 campaign contributions or expenditures” invoked in section 9(f) are best understood as the same kind of limitations that were constitutionally invalidated in Vannatta I and that must, in turn, be permitted by the Oregon Constitution if Measure 47 is to become operational.
Based on the foregoing, and because the Oregon Constitution did not allow such limitations on the effective date of Measure 47, we conclude that the condition provided by section 9(f) for holding Measure 47 in operational abeyance has, indeed, been met here.
The Hazell plaintiffs contend, however, that even if that condition has been triggered, its effect is simply to suspend the limitations contained in Measure 47 pending litigation to determine their validity. They assert that these proceedings are, in fact, that litigation, making it incumbent upon this court to now engage in a provision-by-provision determination of the constitutionality of Measure 47.
We disagree. The only issue properly before this court is whether the Secretary of State and the Attorney General correctly relied on section 9(f) to determine that Measure 47 is essentially a dormant statute. In that regard, plaintiffs have standing under ORS 246.910 to challenge the Secretary of State’s determination that Measure 47 is dormant as an operational matter. See Ellis v. Roberts, 302 Or 6, 11, 725 P2d 886 (1986) (“ORS 246.910(1) requires only that a person be ‘adversely affected’ before he can bring an action challenging an election ruling of the Secretary of State. In effect, this means that any registered voter — and probably others as well — can file an action.”).
But, as noted above, plaintiffs have also invited us to rule on the constitutionality of individual provisions of Measure 47. They neglect, however, to seek any specific relief connected to the application or nonapplication of the individual provisions in question. Requesting only that we now require the Secretary of State and the Attorney General to “administer and enforce all of the provisions of Measure 47” is not enough, under the circumstances of this case, to allege a justiciable controversy under the declaratory judgment act, as to the individual provisions of Measure 47. See Eacret v. Holmes, 215 Or 121, 333 P2d 741 (1958) (complaint fails to state a justiciable controversy *468 under declaratory judgment act where plaintiffs requested no relief except that court declare what the law is). Because plaintiffs have failed to raise an actual controversy relating to the individual provisions of Measure 47, any attempted reexamination of this court’s decision in Vannatta I as it relates to individual provisions of Measure 47 would be only advisory — -a function this court cannot undertake. See Gortmaker v. Seaton, 252 Or 440, 444, 450 P2d 547 (1969) (“In this state, however, we have strong precedent against advisory opinions. Mere difference of opinion as to the constitutionality of an act does not afford ground for invoking a judicial declaration having the effect of adjudication.”); see also TVKO v. Howland, 335 Or 527, 534, 73 P3d 905 (2003) (courts cannot issue declaratory judgments in a vacuum; they must resolve an actual or justiciable controversy). As a result, both the trial court and the Court of Appeals wisely refrained from addressing those questions, as will we. We now turn to the Horton plaintiffs’ contentions.
The Horton plaintiffs take a different approach to section 9(f) than did the Hazell plaintiffs. According to the Horton plaintiffs, section 9(f) must be severed in its entirety, because it allows Measure 47 to become operative without providing adequate notice of that fact to Oregon citizens as required by due process principles and the constitutional provisions related to the effective date of newly enacted measures. They argue that the only legitimate contingencies recognized in Oregon case law have been actual anticipated events — like election outcomes — that are germane to the substance of the suspended law. Here, they contend, the contingency set out in section 9(f) would allow the otherwise dormant law to become operative by inadvertence, surprise, or on an arbitrary event completely decoupled from any expression of assent by the voters or their representatives. The tenets around which a representative democracy are built, the Horton plaintiffs assert, do not include “implied consent to be governed in an arbitrary manner where laws can spring into operation upon later nonpublic contingencies entirely divorced from the express or implied will of the people.”
That argument is unpersuasive, given our interpretation of Measure 47 as set out in this opinion. We have concluded that Measure 47 will become effective as a *469 whole or it will not become effective. We have explained that Oregon voters intended Measure 47 to remain inoperative absent a constitutional amendment like Measure 46 or a controlling judicial construction of Article I, section 8, that effectively reverses Vanatta I. Measures 47 will not, therefore, spring to life based on events that are arbitrary, difficult to describe, or unpredictable. If either of the contingencies noted above occurs, Measure 47 will become effective according to the expressed will of the voters and under terms that they intended. A change of that magnitude will not take place in a closet.
Like plaintiffs in this matter, intervenors also take issue with section 9(f), albeit for different reasons. According to intervenors, when the drafters of Measure 47 provided that the act “shall nevertheless be codified and shall become effective” when the required contingency is met, they used the word “effective” when they should have used the word “operative.” Intervenors contend that that flaw is fatal to the entire measure. They note that, under Article IV, section l(4)(d), initiative or referendum measures become “effective” 30 days after those measures are enacted by a majority of voters. Intervenors appear to argue that, as written, section 9(f) does not actually forestall the operation of Measure 47 but rather resets the effective date, violating the constitutional edict in Article I, section 21, that no laws shall “be passed the taking effect of which shall be made to depend on any authority, except as provided in this Constitution.” They go on to assert that, as a result, all of Measure 47 is invalid and must be struck down.
Given that this court already has construed terms such as “effective” or “shall take effect” as being synonymous and interchangeable with the word “operative,” Oregon law presents an alternative construction to the one proffered by intervenors in this case. In State v. Hecker, 109 Or 520, 221 P 808 (1923), this court examined the constitutionality of a statutory contingency provision not unlike the one at issue here. The contingency at issue in Hecker provided:
“This act shall take effect as soon as and whenever the constitutional provisions of section 36 of article 1 of the Constitution of the state of Oregon relating to the death penalty and any amendment or amendments thereto, will permit.”
*470 Id. at 539 (emphasis added). The court concluded that, as part of that contingency provision, the phrase “shall take effect” was not used in the same sense as the mandate from the Oregon Constitution that legislative acts lacking an emergency clause “shall take effect” 90 days after the end of the legislative session. See Or Const, Art IV, § 28 (so stating). Instead, the court reasoned that, as used within the contingency provision, the phrase was meant to postpone the active operation of the statute until it could operate “contemporaneously with but not before the amendment of the Constitution.” Id. at 547.
Intervenors acknowledge our holding in Hecker, but argue that, since then, the vocabulary of lawmaking has become precise to the point that we should assume that lawmakers now carefully differentiate between the terms “effective” and “operative” and never mean the one when they use the other. Today, the art of drafting statutes may, as intervenors urge, be more sophisticated than in 1920. However, that fact does not circumvent the overarching duty of this court to “avoid any strained construction that would defeat the will of the people, clearly expressed, in the method provided by the Constitution.” State v. Tollerson, 142 Or 192, 198, 16 P2d 625 (1932). Our decision in Hecker is not only instructive here, it also never has been modified (much less overruled) by this court or countermanded by legislative action. Consequently, we conclude that section 9(f), properly read, requires Measure 47 to be codified and held in abeyance pending an appropriate constitutional amendment or judicial decision that will render it operative. Neither the trial court nor the Court of Appeals erred in so holding.
The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

 Measure 47 (2006) is currently codified as a “legislative note” at ORS chapter 259. Among other purposes, such notes are used to signify, as in this case, a special date on which a provision will take effect.